**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Garner,           ) | No. CIV 06-041-TUC-RCC (GEE) |
|                         ) | |
|      Plaintiff,         ) | **REPORT AND RECOMMENDATION** |
|                         ) | |
| vs.                     ) | |
|                         ) | |
| Michael J. Astrue, Commissioner of ) | |
| Social Security,        ) | |
|                         ) | |
|      Defendant.         ) | |
|                         ) | |

The plaintiff filed this action for review of the final decision of the Commissioner for Social Security[1] pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The case has been referred to the United States Magistrate Judge pursuant to the Rules of Practice of this court.

Pending before the court is a motion for summary judgment filed by the plaintiff on September 1, 2006, and a cross-motion for summary judgment filed by the defendant on December 26, 2006. [#16, 22][2]

The Magistrate Judge recommends that the District Court, after its independent review, deny the plaintiff's motion and grant the defendant's cross-motion for summary judgment. The final decision of the Commissioner is supported by substantial evidence.

---

[1] The new Commissioner for Social Security, Michael J. Astrue, is substituted for the original defendant, Joanne B. Barnhart, pursuant to FED.R.CIV.P. 25(d)(1).

[2] Clerk's record number.

PROCEDURAL HISTORY

Garner filed an application for social security disability insurance benefits and supplemental security income benefits alleging a disability that began on April 21, 2002, due to "permanent nerve damage in [right] arm." (Tr. 91).

The Social Security Administration (SSA) denied her application initially and again upon reconsideration. (Tr. 47-55). Garner requested review and on March 15, 2005, appeared with counsel at a hearing before Administrative Law Judge (ALJ) Lauren R. Mathon. (Tr. 56-64, 17-27). The ALJ found Garner was not disabled. (Tr. 17-27). Garner appealed the ALJ's decision, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 6-8); 20 C.F.R. §§ 404.981. She then filed the instant complaint in U.S. District Court appealing the Commissioner's final decision. She filed the instant motion for summary judgment on September 1, 2006. The Commissioner filed the instant cross-motion for summary judgment on December 26, 2006. Garner filed a combined response and reply on March 8, 2007.

Claimant's Work History and Medical History

Garner was born in 1966. (Tr. 82). She graduated from high school and attended two years of college. (Tr. 97, 506). Garner worked as a waitress from 1986 until April of 2002 when an accidental electric shock injured her right arm. (Tr. 91, 97).

The relevant medical record begins in April of 2002 with the report of emergency physician Abdulrahman Qabazard, D.O. (Tr. 199-200). Garner reported experiencing an electric shock in her right arm when she reached into a Jacuzzi spa. *Id.* Qabazard diagnosed electrocution to the right arm and parasthesias. *Id.* He recommended the medications Vicodin, a narcotic analgesic, and Naprosyn, a nonsteroidal anti-inflammatory. *Id.*; Physician's Desk Reference, 535, 2761 (61st ed. 2007).

In September of 2002, Garner was evaluated by Scott C. Forrer, M.D. (Tr. 184-185). Garner reported chronic pain in her right forearm as a result of the electric shock. *Id.* Forrer diagnosed "[t]raumatic right ulnar neuropathy with neuralgic pain attributable to electrical

1  injury." *Id.* For pain, Garner was taking MS Contin and Neurontin, but she expressed a desire
2  to try tapering off the medication. *Id.*

3  In December of 2002, Garner reported she was no longer taking her narcotic analgesic.
4  (Tr. 183). She still complained of burning pain with accompanying numbness. *Id.* Forrer
5  assessed "[t]raumatic right ulnar neuropathy, neurological sequelae ongoing characterized by
6  pain and sensory dysfunction status post electrical injury." *Id.*

7  In December of 2003, Jerry L. Dodson, M.D. , evaluated Garner's medical record for the
8  disability determination service. (Tr. 47, 222-29). He found no exertional, postural,
9  communicative or environmental limitations. *Id.* He found Garner's fingering and feeling was
10  limited on her right side. *Id.*

11  Also in December of 2003, Edgardi Laguillo, M.D., completed a Medical Source
12  Statement for the disability determination service. (Tr. 220-21). Laguillo diagnosed electrical
13  (right) ulnar neuropathy. *Id.* Laguillo limited Garner's ability to lift and carry to less then 10
14  pounds on her right side. *Id.* She could stand or walk or sit for about 6 hours in an 8-hour
15  workday. *Id.* She was limited in her climbing and crawling due to right arm weakness. *Id.*

16  In March of 2004, Laguillo completed a second Medical Source Statement which was
17  essentially the same as his earlier statement. (Tr. 280-81).

18  Also in March of 2004, Fernando Gonzales-Portillo, M.D., evaluated Garner's medical
19  record for the disability determination service. (Tr. 48, 282-89). He limited Garner to lifting
20  or carrying 20 pounds occasionally and 10 pounds frequently. *Id.* She could stand or sit for 6
21  hours in an 8-hour workday. *Id.*

22  In April of 2004 (and updated in May of 2004) Laguillo completed a Medical Work
23  Tolerance Recommendations form. He again stated Garner could not exert up to 10 pounds of
24  force with her right arm. (Tr. 290-93). She could sit, stand, or walk for 8 hours per work day.
25  *Id.* She should not crawl, climb, or reach with her right arm. *Id.* Her medications would
26  decrease her attention and concentration and her ability to drive. *Id.* He explicitly declined to
27  comment on how her medical condition would affect her employability. *Id.*

28

On March 15, 2005, Garner appeared at a hearing before Administrative Law Judge (ALJ) Lauren R. Mathon. (Tr. 502). Garner testified she is disabled due to pain in her arm and the side effects of her medication. (Tr. 510). For pain she takes Neurontan, Vicodin, and Ibuprofen 800's. *Id.* Her medication makes her drowsy and dizzy. *Id.* She has difficulty concentrating. (Tr. 513, 516).

Greg Garner, the claimant's husband, testified that Garner sleeps poorly and has difficulty focusing (Tr. 523-24). She has to lie down a couple times a day. *Id.* She can concentrate on a book for about a half-hour. (Tr. 525). She can watch television for about an hour. *Id.*

Kathleen McAlpine offered expert vocational testimony. (Tr. 532). McAlpine testified that Garner's past work as a waitress required the use of both hands. (Tr. 533-534). McAlpine testified a person who can work with only one hand could work as a hostess, usher/lobby attendant, or security guard . (Tr. 536-37). She testified that Garner could perform these jobs if she had the limitations described in Laguillo's Medical Work Tolerance Recommendation (Tr. 290-93); or the limitations described in the Residual Functional Capacity Assessment of the disability determination physicians, Fernando Gonzales-Portillo and Jerry L. Dodson (Tr. 282-89, 280-81); or the limitations described in Laguillo's Medical Assessment of Ability to do Work-Related Activities (Physical) (Tr. 220-21). If Garner had a moderate limitation on her ability to concentrate, she would be limited to only about half of the security guard jobs. (Tr. 539-40). The availability of the hostess or usher/lobby attendant jobs would be unaffected. *Id.* McAlpine testified there are 405,000 hostess jobs in the national economy and 2,902 such jobs in Arizona. (Tr. 536). There are 112,000 jobs for usher/lobby attendant in the national economy and 1,409 in Arizona. (Tr. 537). She conceded Garner could not work if she had to lie down every two hours. (Tr. 542-43).

Stacy Schonbrun offered expert vocational testimony on Garner's behalf. (Tr. 545). She opined that Garner could not work as a security guard because that job requires writing at least several paragraphs during an average day. (Tr. 546). Further she testified that, "I think the medication might be a factor in acquiring a guard license. . . ." *Id.* Schonbrun opined that

Garner could not work as an usher because ushers need to use both hands to tear tickets and make change. (Tr. 546-47). She testified that someone with even a mild concentration impairment could not perform the hostess job if that impairment caused her to make multiple mistakes on the job. (Tr. 551). She conceded, however, that nothing in the medical record describes the severity of Garner's concentration impairment. *Id.*

On rebuttal, McAlpine stated she was not referring to ushers that take tickets but ushers who show people to their seats. (Tr. 555). She opined that hostesses are not required to do so much writing that Garner would be unable to perform that job. *Id.*

## CLAIM EVALUATION

Social Security Administration (SSA) regulations require that disability claims be evaluated pursuant to a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir.1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If so, then the claimant is not disabled and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two which requires a determination of whether the claimant has a "medically severe impairment or combination of impairments." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limits or restricts his or her "physical or mental ability to do basic work activities." *Id*. If the ALJ concludes the impairment is not severe, the claim is denied. *Id*. Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); 20 C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled, and no further inquiry is necessary. *Ramirez v Shalala,*

8 F.3d 1449, 1452 (9th Cir. 1993). If the claimant's impairment does not meet or equal a listed impairment, evaluation proceeds to the next step.

The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity[3] (RFC) to perform past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If the ALJ concludes the claimant has sufficient RFC, then the claim is denied. *Id*. If the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In determining whether the claimant retains the ability to perform other work, the ALJ may refer to the Medical Vocational Guidelines ("the grids") promulgated by the SSA. *Desrosiers v. Secretary of Health and Human Services,* 846 F.2d 573, 576-577 (9th Cir. 1988). The grids categorize jobs according to their exertional requirements such as sedentary work, light work, or medium work. *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). Based on the claimant's exertional ability, age, education, and work experience, the grids determine whether or not the claimant is disabled. *Id.* The grids are a valid basis for denying claims where they completely and accurately describe the claimant's abilities and limitations. *Id.* at 1101-02. If the claimant has significant non-exertional limitations, the grids do not apply. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir.1993). "Non-exertional limitations are limitations that do not directly affect a claimant's strength." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir.1988). Mental limitations, for example, are non-exertional. *Id.* at 1340-41. If significant non-exertional limitations prevent the claimant from performing the full range of work in any exertional category, the ALJ must take the testimony of a vocational expert to deny the claim. *Id.* at 1341.

The ALJ's Findings

---

[3] Residual functional capacity is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. § 404.1545.

- 6 -

At step one of the disability analysis, the ALJ found Garner had not engaged in any substantial gainful activity since her alleged onset date. (Tr. 26). At step two, she found Garner had severe impairments: right ulnar sensory neuropathy and history of chronic pain. *Id.* At step three, the ALJ found Garner' impairments did not meet or equal the criteria for any impairment found in the Listing of Impairments, Appendix 1, Subpart P, of 20 C.F.R., Part 404. *Id.* The ALJ then analyzed Garner' residual functional capacity. *Id.* She made the following finding:

> The claimant has the following residual functional capacity: she remains capable of a wide range of medium-level work activity on a sustained basis, with limited right arm functioning; she is capable of sitting, standing or walking without limitation throughout an eight hour workday, and she is capable of medium-level lifting/carrying with the left upper extremity; she can lift/carry less than ten pounds with the right upper extremity, but can use the right hand occasionally for simple grasping and pushing/pulling; she has moderately decreased ability to maintain attention/concentration.

(Tr. 26). At step four, the ALJ concluded Garner could not return to her past relevant work. *Id.* At step five, the ALJ concluded that although Garner could not perform the full range of medium work, she could perform a significant number of jobs in the national economy such as hostess, usher/lobby attendant, or security guard. (Tr. 27).

## STANDARD OF REVIEW

An individual is entitled to disability benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "[A] claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy." *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial

1  evidence establishing the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th
2  Cir. 1985).

3  The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g),
4  1383(c)(3). The court may overturn the decision to deny benefits "only if it is not supported by
5  substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th
6  Cir. 1992) (citations omitted). The Commissioner's determination that a claimant is not
7  disabled must be upheld if the Commissioner applied the proper legal standards and the record
8  as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d
9  328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th Cir. 1988);
10 *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as "such
11 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
12 *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Winans v. Bowen,* 853 F.2d
13 643, 644 (9th Cir. 1987). The standard is less than a "preponderance of the evidence" standard.
14 *Matney,* 981 F.2d at 1019.

15 "[I]f the evidence can support either outcome, the court may not substitute its judgment
16 for that of the ALJ." *Matney,* 981 F.2d at 1019 (citing *Richardson,* 402 U.S. at 400). When
17 applying the substantial evidence standard, however, the court should not mechanically accept
18 the Commissioner's findings but should review the record critically and thoroughly. *Day v.*
19 *Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that
20 supports as well as detracts from the Commissioner's conclusion. *Id*. at 1156. A denial of
21 benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing
22 the evidence even though the findings may be supported by substantial evidence. *Frost v.*
23 *Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002); *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.
24 1978).

25 In evaluating evidence to determine whether a claimant is disabled, the opinion of a
26 treating physician is entitled to great weight. *Ramirez v. Shalala,* 8 F.3d 1449, 1453-54 (9th Cir.
27 1993). The Commissioner may reject a treating physician's uncontradicted opinion only if she
28 sets forth clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

1995); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is contradicted by another doctor, the Commissioner may reject that opinion only if she provides specific and legitimate reasons supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. No distinction is drawn "between a medical opinion as to a physical condition and a medical opinion on the ultimate issue of disability." *Rodriguez v. Bowen*, 876 F.2d 759, 761 n.7 (9th Cir. 1989).

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non[-]examining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). "[T]he Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Id.* "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830-31.

When medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). The Commissioner's finding that a claimant is less than credible, however, must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir.1997).

The ALJ need not accept the claimant's subjective testimony of disability, but if she decides to reject it, "she must provide specific, cogent reasons for the disbelief." *Lester,* 81 F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

DISCUSSION

1  The decision of the ALJ is supported by substantial evidence. Her decision to discount 2 Garner's subjective testimony of disability is supported by the record.

3  In this case, the parties are in substantial agreement as to Garner's physical impairment. 4 Her ability to use her right hand is severely limited so she cannot perform work which requires 5 the use of both hands. The parties disagree as to the extent of Garner's pain and the severity of 6 the side effects of her medication. Garner testified at the hearing that she must lie down 7 periodically during the day due to her pain and poor sleep pattern. Further, she claims her 8 medication affects her concentration to the point that she cannot hold gainful employment. The 9 ALJ discounted this aspect of Garner's subjective testimony. She concluded Garner's ability 10 to concentrate is only moderately affected. She did not credit Garner's alleged need to rest 11 beyond the standard breaks allowed during an 8-hour work day. Finally, she concluded Garner 12 could perform a significant number of jobs in the national economy and therefore was not 13 disabled. The record supports the decision of the ALJ.

14  A claimant who alleges disability based on subjective symptoms "must produce objective 15 medical evidence of an underlying impairment or impairments" and "show that the impairment 16 or combination of impairments could reasonably be expected to (not that it did in fact) produce 17 some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "The 18 claimant need not produce objective medical evidence of the pain or fatigue itself or the severity 19 thereof." *Id.* "Nor must the claimant produce objective medical evidence of the causal 20 relationship between the medically determinable impairment and the symptom." *Id.* "Finally, 21 the claimant need not show that her impairment could reasonably be expected to cause the 22 *severity* of the symptom she has alleged; she need only show that it could reasonably have 23 caused *some* degree of symptom." *Id.* (emphasis added).

24  Once a claimant makes the required showing "and there is no affirmative evidence 25 suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the 26 severity of her symptoms only if [she] makes specific findings stating clear and convincing 27 reasons for doing so." *Id.* at 1283-84. "[T]he ALJ may consider, for example (1) ordinary 28 techniques of credibility evaluation, such as the claimant's reputation for lying, prior

1  inconsistent statements concerning the symptoms, and other testimony by the claimant that
2  appears less than candid; (2) unexplained or inadequately explained failure to seek treatment
3  or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Id.* at
4  1284.  In this case, the ALJ gave clear and convincing reasons for discounting Garner's
5  subjective testimony of disability .

6  First, the ALJ noted that Garner's subjective testimony of disability is not supported by
7  any medical source statement. (Tr. 23-24).  Treating physician Laguillo stated that Garner's
8  medications decreased her attention and concentration and her ability to drive.   (Tr. 290-93).
9  He explicitly declined to comment, however, on how her medical condition would affect her
10 employability. *Id.*  Laguillo's reticence to offer an opinion may be interpreted as evidence that
11 Garner's side effects are not as pronounced as she reports. (Tr. 23).

12 The ALJ's conclusion is also supported by Garner's decision in January of 2003 to stop
13 taking her pain medication. (Tr. 19).  Although she later resumed taking medication after about
14 a week because the pain was too great, this is some evidence that her subjective symptoms are
15 not so severe as to be disabling. (Tr. 517).

16 On February 10, 2004, Lois Anzalone, Garner's friend and former co-worker, completed
17 a third party Function Report for the Social Security Administration. (Tr. 118-26).  She stated
18 that Garner can count change, shop for groceries, drive, pay attention "indefinitely," and follow
19 spoken instructions.  (Tr. 22, 118-26).  This is some evidence that Garner's ability to
20 concentrate is only moderately affected by her medication.

21 Furthermore, the ALJ's decision to discount Garner's subjective testimony of disability
22 is supported by her record of daily activities.  The record indicates Garner uses the computer
23 for an hour to an hour and one-half each day, watches television for one hour, reads for one-half
24 hour and cares for her three and one-half year old child. (Tr. 23, 506).  She gets help from her
25 husband, in-laws, and her eldest son, but she cares for the child alone for up to three hours each
26 day. (Tr. 529-31).  Household activities are generally not performed with the same persistence
27 and pace required in the workplace, but they may be considered by the ALJ in evaluating a
28

- 11 -

1    claimant's subjective testimony of disability. *Morgan v. Apfel*, 169 F.3d, 595, 600 (9th Cir.
2    1999).

3    Finally, the ALJ notes that Garner's wages, while she was working, never exceeded
4    $7,112.35. (Tr. 24, 86). If she were disabled, her benefits would be approximately $587 per
5    month. *Id.* Her benefit level would be very close to the wage she would receive if she were to
6    return to work. Accordingly, Garner has little financial incentive to return to work.

7    The ALJ has presented clear and convincing evidence to discount Garner's subjective
8    testimony of disability. None of her physicians conclude she is disabled, and her record of daily
9    activities is consistent with the ALJ's finding that she is not disabled. The ALJ's decision to
10   discount Garner's testimony of disability is supported by the record. *See, e.g., Vaughan v.
11   Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (The ALJ discounted the claimant's subjective
12   testimony of disability in part because "no physician who examined [the claimant] pronounced
13   her disabled" and "she could perform household chores like cooking, making the bed, and
14   washing.").

15   Garner argues the ALJ's salary calculation is incorrect because, while Garner's salary
16   was only $2.12 per hour, the average waitress averages approximately $40-$50 in tips per shift
17   and would earn, on the average, $14,558.88 per year. The ALJ, however, did not estimate
18   Garner's salary based on her pay per hour. She used the income figures actually reported to the
19   government. (Tr. 86). Garner suggests no reasons why these amounts would be incorrect.
20   Accordingly, the ALJ was entitled to rely on these figures.

21   At the hearing, Garner's attorney submitted a videotape to corroborate her testimony of
22   her daily activities. The ALJ accepted the tape but said she did not have the equipment to view
23   it, could not show it to the vocational expert, and would not consider it. (Tr. 521). Garner
24   argues the ALJ violated her "fundamental right to a fair hearing" by failing to view this "crucial
25   material." (Plaintiff's motion, p. 24.)

26   Social security claimants have a due process right to a fair and impartial proceedings.
27   *See Richardson v. Perales*, 402 U.S. 389, 401-01 (1971). In this case, however, Garner does
28   not explain how the ALJ's refusal to view her videotape violated this right. She does not

1  specify what, if anything, was on the tape that was not in her testimony. She does not explain
2  why the failure to view this evidence affected the decision of the ALJ. She cannot establish
3  prejudice. Accordingly, her due process rights were not violated. *See, e.g., Subia v.*
4  *Commissioner of Social Sec.*, 264 F.3d 899, 902-03 (9th Cir. 2001); *Key v. Heckler*, 754 F.2d
5  1545, 1551 (9th Cir. 1985).

6       In her reply brief, Garner advances an additional argument that the ALJ's failure to
7  consider her videotape violated 20 C.F.R. § 404.1512(e)(1). This rule instructs the
8  Commissioner to re-contact a medical care provider if that provider's records or reports are
9  incomplete or ambiguous. The videotape, however, was not evidence from a medical source.
10 Accordingly, this rule does not apply here.

11      Garner further argues McAlpine incorrectly described the duties of an usher/lobby
12 attendant. This job, she maintains, requires the ability to tear tickets. (Plaintiff's motion, p. 32)
13 (citing Tr. 497). Because she cannot use both hands, she would be unable to perform this task.
14 Garner's objection, however, is misplaced.

15      Garner cites to a Bureau of Labor Statistics entry #39-3031 – Ushers, Lobby Attendants,
16 and Ticket Takers. The job description is given as follows: "Assists patrons at entertainment
17 events by performing duties, such as collecting admission tickets and passes from patrons,
18 assisting in finding seats, searching for lost articles, and locating such facilities as rest rooms
19 and telephones." (Tr. 497). This job description includes the taking of tickets.

20      McAlpine, however, was referring to a Dictionary of Occupational Titles code 344.677-
21 014 – usher (amuse. & rec.). (Tr. 537). The job description is given as follows: "Assists
22 patrons at entertainment events to find seats, search for lost articles, and locate facilities, such
23 as restrooms and telephones. Distributes programs to patrons. Assists other workers to change
24 advertising display." www.govtusa.com/dot/dot03a.html. This job description does not include
25 the taking of tickets. Garner's inability to use both hands does not preclude her from
26 performing the duties ordinarily required for the job of usher (amuse. &rec.). Garner's inability
27 to tear tickets does not reduce the number of these positions available to her. *See* (Tr. 537).
28

RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, deny the plaintiff's Motion for Summary Judgment and grant the defendant's Motion for Summary Judgment. [#16, 22, 27]

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 900 (2003).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 9th day of May, 2007.

_____
Glenda E. Edmonds
United States Magistrate Judge